No. 83,955

In the Matter of DAVID R. PLATT, *Respondent.*

(8 P.3d 686)

Opinion filed June 16, 2000.

*Edward G. Collister, Jr.,* of Lawrence, examiner for the Commission on Judicial Qualifications, argued the cause and was on the brief for the petitioner.

*Thomas D. Haney,* of Fairchild, Haney & Buck, P.A., of Topeka, argued the cause and was on the briefs for the respondent. *David R. Platt,* respondent, argued the cause pro se.

*Per Curiam:* This is an original proceeding in discipline involving David R. Platt, a District Judge of the 8th Judicial District (Respondent). In a formal proceeding before the Commission on Judicial Qualifications (the Commission), Respondent was charged with two counts alleging violations of the Code of Judicial Conduct (the Code). Supreme Court Rule 610A (1999 Kan. Ct. R. Annot. 461). Following a formal hearing, the Commission recommended the discipline of public censure. The Commission concluded:

"[W]ithout dissent, the Commission on Judicial Qualifications recommends that Respondent be disciplined by public censure for violations of Canons 1; 2A; 3B(1), (5) and (7); 3C(1); and 3E(1) of the Rules of the Supreme Court Relating to Judicial Conduct. The Commission further notes that the effect of each of these violations was to the professional and financial detriment of those against whom the Respondent had expressed either bias or prejudice or a concern about the appearance of bias or prejudice. The clients of those attorneys likewise suffered a detriment.

"Canon 1 provides that an independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing and should himself observe high standards of conduct so that the integrity and independence of the judiciary may be preserved. Provisions of this code should be construed and applied to further that objective. The violations described above are not of the high standards required by the Code of Judicial Conduct and thus raise questions about the integrity of the judiciary.

"This recommendation for public censure is made after consideration of the fact that Respondent has previously been admonished for a violation of Canons 2A and 3B(7) after a hearing on Notice of Formal Proceedings in Commission on Judicial Qualifications Docket No. 612 and has stipulated to a cease and desist

order in lieu of hearing on Notice of Formal Proceedings in Commission on Judicial Qualifications Docket No. 652."

Respondent takes exception to and appeals from the Commissions' findings, recommendation, and refusal to recuse itself from hearing his case.

A majority of the court adopts the recommended discipline of public censure. " 'Discipline' means public censure, suspension or removal." Supreme Court Rule 620 (1999 Kan. Ct. R. Annot. 498). The minority would impose either suspension for a definite period or removal.

## RESPONDENT'S ISSUES

The issues raised by Respondent are whether: (1) the Commission's findings of fact and conclusions of law are supported by clear and convincing evidence; (2) the Commission's consideration of a prior admonishment and cease and desist order in reaching a disciplinary recommendation was appropriate; (3) the Examiner failed to disclose or withheld exculpatory evidence; (4) the Commission procedures violated either the Kansas or United States Constitution separation of powers provisions; (5) the Commission procedures violated equal protection principles; (6) the Respondent's right to procedural and substantive due process was violated by the participation of nonlawyer commission members in the decision-making process; (7) the Commission failed to properly recuse itself from hearing this case; and (8) the Respondent received a fair and impartial hearing under applicable statutes, rules, and regulations of the Commission.

## THE COMMISSION HEARING

In December 1998, a Notice of Formal Proceedings was filed with the Commission under Supreme Court Rule 611(b) (1999 Kan. Ct. R. Annot. 494) alleging violations of the Code of Judicial Conduct, Canons 1 (1999 Kan. Ct. R. Annot. 465); 2A (1999 Kan. Ct. R. Annot. 465); and 3B(1), (5) and (7); 3C(1); and 3E(1) (1999 Kan. Ct. R. Annot. 466).

At the August 16, 1999, Commission hearing, the Examiner and the Respondent called witnesses, introduced evidence, and pre-

sented arguments. A unanimous eight-member Commission made findings of fact and conclusions of law establishing violations of the Canons charged. Commission members present for the hearing were: David J. Waxse, an attorney, Chair *pendente lite*; District Magistrate Judge Kathryn Carter; Chief Judge J. Patrick Brazil, of the Kansas Court of Appeals; Ray Call, a lay member; Robert A. Creighton, an attorney; Senior Judge James W. Paddock; Carol Sader, a lay member; and Mikel L. Stout, an attorney. District Judge Theodore B. Ice did not participate.

The specific Canons charged and found by the Commission to have been violated provide in part:

"CANON 1

"*A Judge Shall Uphold the Integrity and Independence of the Judiciary*

"A judge. . . shall. . . observe those standards so that the integrity and independence of the judiciary will be preserved. . . 1998 Kan. Ct. R. Annot. 449.

"2. Canon 2 of the Rules of the Supreme Court Relating to Judicial Conduct, as set out in Rule 601A of the Rules of the Kansas Supreme Court provides, *inter alia:*

"*A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities*

"A. A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary. 1998 Kan. Ct. R. Annot. 449.

"3. Canon 3 of the Rules of the Supreme Court Relating to Judicial Conduct, as set out in Rule 601A of the Rules of the Kansas Supreme Court provides, *inter alia:*

"*A Judge Shall Perform the Duties of Judicial Office Impartially and Diligently*

"B. Adjudicative Responsibilities.

(1) A judge shall hear and decide matters assigned to the judge except those in which disqualification is required.

. . . .

(5) A judge shall perform judicial duties without bias or prejudice. A judge shall not, in the performance of judicial duties, by words or conduct manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status, and shall not permit staff, court officials and others subject to the judge's direction and control to do so.

. . . .

(7) A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law.

A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding except that:
. . . .

"C. Administrative Responsibilities.

(1) A judge shall diligently discharge the judge's administrative responsibilities without bias or prejudice and maintain professional competence in judicial administration, and should cooperate with other judges and court officials in the administration of court business.
. . . .

"E. Disqualification.

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned. . . .

"Commentary

"Under this rule, a judge is disqualified whenever the judge's impartiality might reasonably be questioned, regardless whether any of the specific rules of Section 3E(1) apply.
. . . .

(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding. 1998 Kan. Ct. R. Annot. 450-455."

Respondent answered, denying the allegations. He asserted that the procedures established by the Commission are fundamentally unfair and violate constitutional safeguards.

A review of the hearing is helpful in understanding the Commission's findings.

The proceedings began with opening statements by the Examiner and Respondent. The Examiner explained that the complaint against Respondent stemmed from Respondent's disqualification policy with respect to several attorneys. In 1995, Respondent decided he would not hear newly filed cases from the Junction City law firm of Hoover, Schermerhorn, Edwards, Pinaire and Rombold (the "Hoover firm"). The Hoover firm attorneys were Richard Pinaire, Peter C. Rombold, and Mark Edwards. In 1997, Respondent decided he would no longer hear cases filed by a solo practice Junction City attorney, Walter P. Robertson. Respondent also established an "informed consent policy." Members of the Hoover firm and Robertson could appear before him, but only if they obtained, in writing, an informed consent document from their client. Respondent refused to disqualify himself from ongoing cases in-

volving either the Hoover firm or Robertson. In the Examiner's view, Respondent's behavior in setting his policy of refusing to hear certain cases without an "informed consent" violated the Code. Specifically, the Examiner argued, the policy does not conform to the procedure set forth in Canon 3E and F (1999 Kan. Ct. R. Annot. 466) for disqualifying oneself from hearing cases. In addition, the Examiner argued that the manner in which the Respondent dealt with the attorneys and their clients evidenced further violations of the Code.

We note here, to aid the reader, that these "informed consent" documents were to explain to the clients of the Hoover firm that Respondent did not normally hear cases from the firm, but the case would proceed if the client consented. Respondent never formally instructed the Hoover firm as to the exact language required for the informed consent. Examples of informed consents are included in the Commission's findings which are set out in our opinion. (Finding of Fact 4, Count I, a form used by Pinaire, Finding of Fact 4, Count II, the Robertson form.) Respondent did instruct Robertson as to the content of his informed consent documents.

The Respondent countered the Examiner's contentions, asserting that his disqualification policy conformed to the Canons. He explained that he and the other judges of the 8th Judicial District were informed of a lawsuit filed by the Hoover firm naming the district as a defendant. At that time, he and other judges expressed a concern that hearing cases from the Hoover firm would create an appearance of impropriety. Respondent therefore established his disqualification policy, refusing to hear cases from the Hoover firm. Respondent contends Judges Bengtson, Johnson, and Powers all initially advised the Hoover firm that they would not hear its cases.

There were different reasons for the disqualification with respect to Robertson. Respondent decided not to hear Robertson's cases because "Mr. Robertson had not been truthful with me and the requirement of candor to a tribunal I felt had been violated and considered actually filing a complaint with the disciplinary administrator." Respondent did not file a complaint, but did write to Robertson and explain he would no longer hear Robertson's cases.

Respondent sees nothing improper about his informed consent policy, likening it to a Canon 3F "remittal of disqualification." Respondent denied a personal bias or prejudice toward the Hoover firm, but admitted he expressed a personal bias toward Robertson. Respondent viewed the conflict with the Hoover firm as one of the firm's own making. In other words, because the Hoover firm filed the lawsuit, the firm created the conflict, and the firm had the burden of remedying the conflict. Respondent expressed the view that it was the responsibility of the attorneys involved to file a K.S.A. 20-311d disqualification motion if they had any problems with his policy. Respondent also expressed a concern that the attorneys were "judge shopping" or using his disqualification for a tactical advantage.

## The Testimony

Administrative (Chief) Judge Michael Powers was called by Respondent. He testified that, although a concern was expressed about a conflict, none of the judges other than Respondent instituted a formal disqualification policy. Respondent did not discuss his policy with Judge Powers before implementing it. When asked about the lawsuit, Judge Powers stated the district's name was deleted from the caption of the suit shortly after it was filed. Judge Powers also testified that the petition did not name any specific judge of the district.

Lawyers from the Hoover firm also testified. Pinaire first learned of Respondent's disqualification policy in December 1995 when he came before Respondent in a contested divorce case. Pinaire represented the husband, a soldier stationed in Korea. The soldier had traveled to Junction City from Korea for the hearing. Upon arriving at the courthouse for the hearing, Pinaire was informed Respondent would not hear the case. Pinaire contacted Judge Powers. Respondent then agreed to hear the soldier's testimony for preservation purposes only. The case was heard by Judge Scott 10 months later. The soldier traveled from Korea a second time to attend the contested hearing before Judge Scott. Respondent failed to inform Pinaire or the Hoover firm of his new policy before Pinaire and his client arrived at the courthouse for the hearing.

Rombold, another member of the Hoover firm, learned of Respondent's policy when he was scheduled to appear before Respondent on a domestic case. In that instance, Judge Bengtson announced that Respondent had recused himself from the case. This was the first time Rombold heard of the disqualification policy. Respondent never communicated the parameters of his policy nor the basis for it to Rombold. On the next occasion Rombold was to appear before Respondent, Respondent asked Rombold to prepare an informed consent or the case could not proceed.

It then became understood to members of the Hoover firm that Respondent would not hear their cases unless they obtained an informed consent document from their clients. Cases filed by the Hoover firm would be assigned to a different judge. However, in ongoing cases in which the Respondent was already involved, and new cases in which the Hoover firm entered as defense counsel, the informed consent policy would apply. In other words, the disqualification policy came to be selectively enforced by Respondent. For example, in a later case in which Rombold appeared on behalf of a DUI defendant, Respondent did not recuse, but asked Rombold to obtain an informed consent from his client. The case proceeded after Rombold prepared and filed the consent. (Respondent did not create a form. Drafting was left to the attorneys.)

Edwards of the Hoover firm also testified. Edwards did not use a written form in his dealings with Respondent. In a contested custody hearing, Respondent asked Edwards whether his client knew Respondent did not hear Hoover firm cases. Edwards then stated for the record, *"Judge Platt for some reason doesn't like our law firm and he doesn't hear our cases, now if you want me to go forward we will but you're going to need to acknowledge to the judge that you have been informed about this."* After the client acknowledged these remarks, the case proceeded. In a second case where the same exchange occurred, the client did not agree to proceed. The case was then reassigned.

Later, Respondent modified his informed consent policy again. He decided he should remain on a case despite an appearance by the Hoover firm or Mr. Robertson, even if the client did not wish to give informed consent. In another case assigned to Respondent,

Rombold entered an appearance but also filed a motion for recusal under K.S.A. 20-311d. Rombold sent a copy of the motion to Administrative Judge Powers. Respondent refused to recuse and insisted on hearing the case. Respondent suggested that Rombold file an affidavit with the administrative judge (Judge Powers) because it was Rombold's conflict and not the Respondent's conflict. Upon seeing the 20-311d motion, Judge Powers automatically reassigned the case, believing it error that the case was ever assigned to Respondent in the first place. At this time, Rombold and Edwards concluded that Respondent now wished them to file 20-311d motions for recusals in cases assigned to Respondent.

Robertson also testified. Respondent wrote a July 24, 1997, letter to Robertson stating he had a bias against Robertson because of some "untruthful statements" allegedly made by Robertson. The alleged untruthful statements related to a woman named Javette Campbell. These facts are lengthy, but assist in understanding the actions Respondent took toward Robertson.

Campbell is the juror at the center of Respondent's first judicial disciplinary proceeding (Docket 612), resulting in admonishment. Campbell failed to appear on numerous occasions for jury duty. As a result, Campbell was arrested several times on bench warrants. Later, Respondent issued a bench warrant and instructed on the warrant that no bond would be set.

A friend of Campbell's, a client of Robertson's, contacted him on behalf of Campbell. Robertson went to the courthouse to examine the Campbell file. He was told that Respondent kept the Campbell file in his chambers. Robertson went to Respondent's chambers to view the file. Robertson asked Respondent's secretary to speak with Respondent. The secretary said, "No you may not." She further said, "He has told me to tell you and all other attorneys that he will see them in court if they want to assist Javette Campbell." Robertson decided not to handle the case himself. He contacted three attorneys to ask whether they might help Campbell. Tom Barnes, a Topeka attorney, indicated he might represent Campbell. Robertson then wrote to Campbell informing her Barnes might take her case. At the request of Barnes, Robertson copied the Campbell court file and mailed it to Topeka. According

to the record here, that was the substance of Robertson's involvement in the Campbell case. Campbell was incarcerated and later released on a K.S.A. 60-1507 habeas corpus petition after spending approximately 40 days in jail. Respondent incarcerated Campbell without formally finding her in contempt and without formally imposing a sentence. The Commission found:

"There was no court hearing where Ms. Campbell had been confronted with an accusation in contempt, where she was determined to be in contempt, or where a sentence of six months incarceration had been imposed.

"Ms. Campbell was confined for approximately 40 days, and, in addition, a Child in Need of Care (CINC) action was commenced against her in the District Court of Geary County, Kansas, because she was unable to care for her children while incarcerated."

At a May 1996 hearing on a matter unrelated to Campbell pending before Respondent, Respondent informed Robertson, in open court, that Respondent should recuse himself from all of Robertson's cases. Respondent asked whether Robertson was going to sue him on behalf of Campbell. Robertson replied, "Judge, I'm not going to sue you, I'm not involved in those cases." Later, during the Commission proceedings involving Campbell's incarceration, Respondent obtained from the Examiner the letter written by Robertson to Campbell. Respondent then wrote the July 24, 1997, letter to Robertson stating he would no longer hear Robertson's cases because Robertson had been untruthful about his involvement in the Campbell case.

Robertson had no further proceedings in front of Respondent except for an uncontested divorce. Robertson submitted a proposed agreed-upon journal entry and a signed client informed consent form. In another case, Robertson asked Respondent to recuse. Robertson represented a client, T.J., in a medical malpractice action. T.J.'s leg had to be amputated after it became infected. (The malpractice action was not before Respondent.) T.J. then sought Robertson's aid in having a divorce settlement set aside. The divorce case was already before Respondent. T.J. did not wish to sign an informed consent but wished to retain Robertson as her attorney. Robertson wrote to Respondent and attached a 20-311d motion on July 29, 1998. Robertson filed the motion on August 3. The

hearing was set for August 10. Robertson received no response to his letter or motion. Because of a scheduling conflict, Robertson asked another attorney to appear for him and request a continuance at the August 10 hearing. (Robertson informed Respondent of the conflict in his July 29 letter.)

At the August 10th hearing, Respondent refused to recuse himself. In a journal entry reflecting his ruling, Respondent stated there was "no valid reason for th[e] Court to voluntarily recuse." Respondent stated that the only way he would hear Robertson's case was with an informed consent. Respondent also made a veiled threat of referring Robertson to the Disciplinary Administrator if Robertson attempted to appear without the informed consent. Upon hearing these statements, T.J., according to Robertson, was "very upset, tearful." She eventually terminated Robertson's services and hired alternate counsel. Robertson went to the Geary County courthouse to listen to the tape recording of T.J.'s August 10th post-divorce matter. He testified before the Commission:

"Well, I've got to say the reason I listened to this tape at least three times is I couldn't, it was hard to determine his [Respondent's] position, there's at least two or three positions on this tape. He says that he's going to, he will not recuse himself, he then says that if I file a motion he may recuse himself, and then he says that if I enter a case without an informed consent and that results in delay of the case he will refer the matter to Stan Hazlett, disciplinary administrator, and so I don't — since I've never talked to Judge Platt, I've written him a few letters, none of which he's ever responded to, it has been my understanding that he was not going to recuse himself and that if I came, attempted to come in without an informed consent something bad would happen to me. Now what that bad thing was going to be I don't know."

Respondent's testimony mirrored his opening statement. Respondent denied a personal bias toward the Hoover firm. He simply believed there was an appearance of impropriety in his handling cases from the Hoover firm. His rationale for refusing to disqualify himself in certain cases was twofold. First, he viewed the conflicts as the attorneys', not his. Second, in cases already pending before him, he did not automatically recuse because he did not want the attorneys to "judge shop" or cause delay. Respondent argued a Hoover firm attorney might enter an appearance in a case pending before Respondent so that the case would automatically be trans-

ferred to another judge. When asked by the Examiner whether such a situation had ever presented itself, *Respondent admitted no such event had occurred.*

The Examiner also questioned Respondent about the lawsuit that prompted his disqualification policy with the Hoover firm. Respondent stated there were rumors circulating about the underlying facts of the case. The substance of the rumors was not discussed. However, the rumors, according to Respondent, were bordering on a scandalous nature, and he testified, "I think in the rumors that were circulating I think that my name had been mentioned there, though." Respondent admitted none of the Hoover attorneys were responsible for the rumors. Respondent also admitted he was neither a party defendant nor a person identified as sharing responsibility for the wrongs alleged in the lawsuit filed by the Hoover firm. In fact, that lawsuit was dismissed in 1998, but Respondent did not change his disqualification policy, and it continued up until today.

## THE COMMISSION'S FINDINGS AND CONCLUSIONS

The Commission set out its findings and conclusions in its September 30, 1999, opinion:

### "COUNT I
### FINDINGS OF FACT

"The Commission concludes the following facts are established by clear and convincing evidence.

"1. That from a period of 1995 to 1999, Respondent for a reason then unknown to the Hoover, Schermerhorn, Edwards, Pinaire and Rombold law firm informed Mark Edwards, Richard Pinaire and Peter Rombold that any new causes filed by their firm which might be assigned to him through the standard procedure of rotating assignment would be re-assigned randomly to another judge, and he would not hear those cases. Respondent did not disclose on the record the basis of his disqualification and ask the parties and their attorneys to consider out of his presence the basis of his disqualification, as would have been required by Canon 3F. He informed the members of that law firm that they would have to secure a document called an 'informed consent before he could hear any case in which they wished to appear which was either already filed and assigned to the Respondent, or assigned to Respondent prior to institution of the new procedure with new matters to be hear, such as a post divorce matter.

"2. Respondent did not disqualify himself in those cases in which a Hoover law firm attorney appeared which had been assigned to Respondent prior to the adoption of the policy preventing assignment to him of new Hoover law firm cases.

"3. The Respondent perceived an appearance of impropriety in his hearing cases in which a member of the Hoover law firm appeared, and that his impartiality might reasonably be questioned.

"4. The 'informed consent' consisted of the following:

'COMES NOW Richard A. Pinaire, of the law firm of Hoover, Schermerhorn, Edwards, Pinaire, & Rombold, and hereby gives notice to the Court that [client] has been informed that the Honorable David Platt is not assigned cases in which the law firm of Hoover, Schermerhorn, Edwards, Pinaire & Rombold is participating when said firm files cases in the District Court of Geary County, Kansas and that said Honorable Judge does not automatically recuse himself from cases that are assigned to him which are filed by other parties originally, in which said law firm enters its appearance.'

'Furthermore, the Court is advised that [client] has no objection to have this Court approving the proposed Journal Entry which has been submitted for approval based upon the understanding that this matter is being resolved on an uncontested basis.'

"5. On or about May 24, 1999, a member of the Hoover law firm filed a Motion for Recusal in Geary County District Court case 97D912, *Hay vs. Hay,* which was assigned to the Respondent. The Respondent denied the motion and did not disqualify in that matter.

## "COUNT I
### CONCLUSIONS OF LAW

[The Commission set out the Canons charged in the Notice of Formal Proceedings. All were found to have been violated.]

"4. The Respondent's informed consent policy and failure to disqualify himself with regard to cases involving the Hoover, Schermerhorn, Edwards, Pinaire & Rombold law firm while his impartiality might reasonably be questioned violates the Canons heretofore cited. If, in any proceeding in which a member of the Hoover law firm appears, the Respondent's impartiality might reasonably be questioned, or there exists an appearance of impropriety, then the Respondent shall disqualify himself each and every time one of the firm attorneys appears in a case assigned to him.

## "COUNT II
### FINDINGS OF FACT

"1. On July 24, 1997, Respondent wrote a letter to Walter P. Robertson, a Junction City attorney, reflecting bias and prejudice against Mr. Robertson informing him 'I don't believe it would be appropriate for me to hear any of your cases.' The letter set out the procedure to be followed by which any new

case filed by Mr. Robertson which would be assigned to the Respondent by the standing procedure of rotating assignment would be automatically reassigned to another judge. The Respondent informed Mr. Robertson that cases currently pending would be reassigned and

'Any cases that are assigned to me that you wish to enter an appearance on is entirely up to you, but I would need written informed consent from your client that they have no problem with you appearing in front of me.'

"2. For any case already filed in Respondent's division the attorney was to obtain an 'informed consent' to appear in the case. Such might occur when a new case was filed and Mr. Robertson would represent a defendant after the case had been assigned by a clerk to Respondent, or when old cases assigned to Respondent prior to the adoption of the policy preventing assignment to him in new Robertson cases had new matters to be heard, such as a post divorce matter, and Mr. Robertson desired to appear on a the new matter.

"3. Respondent did not disqualify himself in the latter groups of cases when Mr. Robertson appeared in a case previously assigned to Respondent.

"4. The 'informed consent' consisted of the following:

"I, [client] hereby acknowledge that I have been informed by my attorney, that I must give a written consent in order that the Honorable David R. Platt, hear the Order for Annulment in this matter. I am informed that Judge Platt has a bias against my attorney, but I believe that since there is no property, no debts, no children, nor maintenance involved in this matter, and this case is uncontested, I feel he should be able to grant a decree in this matter without any bias to me. I am therefore consenting to such hearing by Judge Platt.

"5. That on August 3, 1998, Mr. Robertson filed a Motion for Change of Judge in the case of *Jenkins v. Jenkins,* Case No. 98 D 00352, when a pre-existing client of Mr. Robertson wished her lawyer, Mr. Robertson, to represent her as respondent in a newly filed divorce action and did not wish to sign an 'informed consent.' On August 10, 1998, Judge Platt, at a pre-trial hearing denied the motion.

## "COUNT II
### CONCLUSIONS OF LAW

"1. Cannon 1 of the Rules of the Supreme Court Relating to Judicial Conduct, as set out in Rule 601A of the Rules of the Kansas Supreme Court which provides, *inter alia:*

[The language of the specific Canons violated, which we have earlier set out, is stated.]

"4. The informed consent policy and failure to disqualify himself with regard to cases involving attorney Walter P. Robertson violate the Canons heretofore cited. If respondent is biased or prejudiced, he must disqualify himself each and every time this attorney appears in a case assigned to him."

## RESPONDENT'S CONTENTIONS ON APPEAL

We next address each of Respondent's numerous exceptions to the Commission's findings and recommendation.

### Clear and Convincing Evidence

Respondent first takes exception to the Commission's factual findings with respect to Counts I and II. We review the Commission's findings for clear and convincing evidence. See Supreme Court Rule 620; *In re Rome*, 218 Kan. 198, 206, 542 P.2d 676 (1975).

As to Count I, Respondent argues the Commission's findings are in error because none of the attorneys followed the procedures set out in K.S.A. 20-311d for seeking the disqualification of a judge. Under 20-311d, if a party or party's attorney believes that the judge hearing the case cannot afford that party a fair trial, a motion for a change of judge may be filed. A procedure must then be followed to resolve the motion. The judge may recuse himself or herself. If the judge refuses to recuse himself or herself, the party may seek action from the administrative (now chief) judge.

The error in Respondent's reasoning is his failure to recognize what is required by the Code. The Commission's criticisms do not stem from Respondent's decision to disqualify himself, rather they are based on Respondent's execution of that decision. The Canons simply do not permit the procedure employed by Respondent.

Canon 3E says:

"(1) A judge *shall* disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:

(a) *the judge has a personal bias or prejudice* concerning a party *or a party's lawyer* . . . ." (1999 Kan Ct. R. Annot. 471-72.) (Emphasis added.)

Here, Respondent unilaterally declared an appearance of impropriety. The Commission did not take issue with Respondent's declaration. The Commission found Respondent's irregular application of that decision, through the informed consent policy, a violation of the Canons. The Commission's approach was correct. We are not reviewing the basis for Respondent's decision or determining whether it was justified under the facts. We review his conduct in relation to that decision.

The procedure whereby a litigant may waive a judge's disqualification is set out in Canon 3F.

"Remittal of Disqualification. A judge disqualified by the terms of Section 3E may disclose on the record the basis of the judge's disqualification and may ask the parties and their lawyers to consider, out of the presence of the judge, whether to waive disqualification. *If following disclosure of any basis for disqualification other than personal bias or prejudice concerning a party, the parties and lawyers, without participation by the judge, all agree the judge should not be disqualified, and the judge is then willing to participate, the judge may participate in the proceeding.*" (1999 Kan. Ct. R. Annot. 473.)

As the italicized language clearly states, in cases involving bias or prejudice concerning a party, a waiver of the disqualification may not be obtained. The Commission seemed to question whether Respondent's decision to disqualify himself from hearing Hoover firm cases was based on bias or prejudice. There was evidence to this effect. For our purposes, it is unnecessary to determine the basis of Respondent's decision. Whatever the basis, Respondent's actions following the decision were improper.

Respondent's belief that hearing cases from the Hoover firm created an appearance of impropriety required his disqualification in *all* cases involving the Hoover firm, not just those *filed* by its members. Respondent, by his own declaration, was "a judge disqualified by the terms of Section 3E." The only method available to obtain a waiver of the disqualification is that set out in Section 3F. Respondent's informed consent policy is not consistent with Section 3F. Under Section 3F, if no bias or prejudice against a party is involved, the judge may disclose on the record the basis of his or her disqualification and ask the parties and their lawyers whether they wish to waive the disqualification. Only if the parties and their lawyers agree may the disqualification be waived. If the parties do not agree, the judge remains disqualified.

Respondent's informed consent procedure was not appropriate. The parties did not waive disqualification. Respondent refused to acknowledge his disqualification. His procedure placed litigants who did not wish to waive the disqualification in the position of firing their counsel of choice or seeking disqualification under K.S.A. 20-311d. Moreover, when presented with a 20-311d motion,

Respondent still refused to acknowledge his disqualification. This was improper.

Respondent's insistence that the conflict was that of the attorneys, and not his own, is a nonsensical explanation of his actions. It was Respondent who declared an impropriety existed—not the attorneys. None of the attorneys understood or agreed with the basis of Respondent's decision to disqualify himself. Nonetheless, the attorneys, as well as the Commission, did not take issue with that decision. Respondent disqualified himself under Section 3E. Respondent insists his decision to disqualify places a burden on the litigants before him to seek a 20-311d disqualification when he *chooses* not to recognize his own disqualification. The suggestion is untenable.

In addition, Respondent's "judge shopping" and "delay" allegations are without a basis in fact. On cross-examination, Respondent admitted there was no evidence of such situations. There is no suggestion in the record that any Hoover attorney or Robertson entered a case either to delay or to effect a transfer of the case out of Respondent's division.

Respondent's policies of disqualification as reflected in the record appear to us to have had the effect of complicating the professional life of the attorneys to whom it applied, rather than avoiding an appearance of impropriety. This is particularly true where Robertson is concerned.

A similar analysis applies with respect to Count II (the Robertson matter). Based on the record before us, we are puzzled by Respondent's claims that Robertson "lied" concerning the Campbell matter. The record supports an alternative view that would reflect favorably on Robertson, *i.e.*, that Robertson was assisting Campbell, who was incarcerated, in securing counsel to represent her in obtaining her freedom. Moreover, Respondent apparently implemented his disqualification policy without consideration of the effect it would have on litigants. The Commission asked Respondent why he chose to put the burden of seeking his recusal on the litigants and attorneys rather than simply disqualifying himself. Respondent acknowledged it would have been simpler if he had made

an across-the-board disqualification policy. We wholeheartedly agree.

Respondent admitted a personal bias against Robertson. The admission of a personal bias raises a question about whether a waiver could be obtained *at all* in Robertson's case. Section 3F excludes a waiver of the disqualification where the bias or prejudice concerns a party. Respondent contends this exclusion does not apply because his prejudice was not against a party, but the party's attorney. Such a distinction is dubious. See *State v. Davis*, 159 Ga. App. 537, 539, 284 S.E.2d 51 (1981) (judicial prejudice against counsel would vicariously result in judicial prejudice against a represented party); *Kanjorski v. Dept. of Labor and Ind. Commw*, 44 Pa. 128, 131-32, 403 A.2d 631 (1979) (holding workers compensation referee who had a personal bias against an attorney properly recused from all cases involving said attorney).

Regardless of whether a wavier could be sought in Robertson's cases, Respondent's conduct was improper here for the same reasons discussed in our analysis of Count I. Respondent cannot force a waiver of his own disqualification. Respondent unilaterally disqualified himself from hearing cases filed by Robertson. It was improper for Respondent to place Robertson in the awkward position of obtaining informed consents from clients Robertson was defending in cases where Respondent refused to acknowledge disqualification. Respondent's June 24, 1997, letter instructed Robertson to include in the informed consent the basis of Respondent's bias. Thus, Respondent would have Robertson tell his clients that Robertson made untruthful statements to Respondent regarding the Javette Campbell matter. Robertson clearly did not agree that he made untruthful statements and attempted to explain his position to Respondent in writing. Respondent gave no response. Robertson was asked on cross-examination by Respondent's counsel, "Can you tell us why you had difficulty, then, or didn't want to discuss with clients the informed consent issue?"

Robertson replied:

"Because I think it reflects poorly on the system. It reflects—to tell—also keep in mind that these facts are evolving. I had no—I got informed consent early on but we got to the point where you have to say to the client let me tell you about

Judge Platt, Judge Platt is upset with me to the extent that he's recused himself in a bunch of my cases. If you want me to represent you in this case either you sign informed consents acknowledging that he's biased but stating you want him to hear the case even so, I cannot recommend to you, my client, that you do that, I cannot recommend to anybody that they appear in front of a judge who's going to make decisions with this kind of a background. The next step is for me to go ahead and file a motion asking him to recuse himself, based upon my experience he's not going to do that. I think it's going to upset him but I don't think he'll do it."

The letter of June 24 to Robertson was the only written explanation Respondent ever gave regarding his informed consent policy. He failed to respond to any of the six letters written to him by the attorneys involved here.

Respondent's conduct did not operate to avoid the appearance of impropriety. He argues that he acted to protect the litigants and attorneys, but his conduct does not bear out this assertion. Respondent refused to acknowledge his own disqualification and transfer cases in which clients did not wish to sign a waiver. Robertson and others were forced to turn away clients who came to them for assistance if their case was pending before Respondent.

After a thorough review of the record, we can say without hesitation that Respondent's actions were improper and in violation of Canons 1 (uphold the integrity of the judiciary); 2A (avoid appearance of impropriety); and 3B(1) (judge shall hear and decide all matters except where disqualification is required), (5) (judge shall perform judicial duties without bias or prejudice) and (7) (judge shall accord party and lawyer right to be heard); 3C(1) (judge shall diligently discharge duties without bias or prejudice), and 3E(1) (judge shall disqualify himself or herself where impartiality in question). The Commission's findings as to both Count I and II are supported by clear and convincing evidence.

Consideration of a Prior Admonishment
and a Cease and Desist Order

Respondent next takes issue with the Commission's reliance on his prior admonishment involving the juror Javette Campbell, Docket 612, and his stipulation to a cease and desist order in lieu

of formal proceedings in Docket 652 (the second time Respondent was before the Commission).

The cease and desist order involved a procedure adopted by Respondent in Chapter 61 proceedings. This procedure allowed clerks to issue orders to show cause and bench warrants without Respondent's review.

Respondent argues, without citing any authority, that the Commission may not rely on the prior admonition and cease and desist order in recommending his discipline here. Respondent suggests that because the dispositions of Dockets 612 and 652 are "non-appealable, non-disciplinary actions," they may not be used for enhancing his punishment. We have discussed Docket 612 (Javette Campbell's incarceration). Docket 652 was resolved by Respondent signing a cease and desist order under Supreme Court Rule 611 (1999 Kan. Ct. R. Annot. 494). This case and Docket 652 were scheduled to be heard on August 16, 1999. At the beginning of the hearing, Respondent agreed to sign the cease and desist order if the Commission would dismiss the allegation that Respondent failed to cooperate in the Commission's investigation. The Commission granted his motion. By signing the order, Respondent agreed to accept the Commission's conclusions that he violated Canons 1; 2; 3B(1), (2) (maintaining professional competence), (7) and, (8) (dispose of matters promptly, efficiently and fairly); and 3C(1) (diligently discharge duties) and (2) (supervise staff) (1999 Kan. Ct. R. Annot. 465, 466, 467, 470). The Commission order said, in part: "Since it now appears that those types of procedures have ceased, no action other than this cease and desist order is required."

We take prior informal admonitions into consideration when disciplining attorneys. See, e.g., In re Ketter, 268 Kan. 146, 153, 992 P.2d 205 (1999) (considering two prior informal admonitions in reaching disciplinary decision). It is appropriate to consider past disciplinary encounters to, among other things, (1) assess whether there is a pattern of misconduct, (2) negate claims of mistake, and (3) deter future misconduct. Whether consideration of prior dealings with the Commission results in a "enhancement" of the Commission's disciplinary recommendation is immaterial, as that rec-

ommendation is not binding on this court. See *In re Handy*, 254 Kan. 581, 599, 867 P.2d 341 (1994).

## Exculpatory Evidence

Respondent argues the Examiner withheld exculpatory evidence. His claim relates to the cease and desist order, Docket 652. Respondent has agreed with the Commission as to the resolution of Docket 652. The matter presently before us concerns Respondent's actions in Docket 683. Respondent's exculpatory evidence claim in Docket 652 is moot.

## Separation of Powers

Respondent takes issue with the Commission's procedures as a violation of separation of powers. This argument carries no merit. Respondent, without any citation of authority, suggests we have unlawfully delegated our power of disciplining judges to the Commission. The Commission does not impose discipline. Under Supreme Court Rule 620 (1999 Kan. Ct. R. Annot. 498), the Commission may "(1) admonish the judge, (2) issue an order of cease and desist, or (3) recommend to the Supreme Court the discipline or compulsory retirement of the judge." "Admonish" is to caution or advise. Black's Law Dictionary 48 (6th ed. 1990). Judges, like attorneys, may not appeal an admonition. See Supreme Court Rule 211 (1999 Kan. Ct. R. Annot. 234), *In re Carson*, 268 Kan. 134, 135, 991 P.2d 896 (1999). The Commission lacks the power to impose any form of "discipline." The Commission makes an unbinding recommendation of discipline. We decide and impose discipline on judges in appropriate cases. See *In re Handy*, 254 Kan. at 598-99.

## Equal Protection Principles

Respondent's equal protection argument is bizarre. He asserts error in the disparate treatment between the manner in which the State of Kansas, acting through this Court, disciplines sitting judges as opposed to other professionals.

We discipline only judges and attorneys. Respondent first suggests a different standard of proof is required in each type of disciplinary case. His suggestion is erroneous. The standard of proof

in both judicial discipline and in attorney discipline matters is clear and convincing evidence. See Supreme Court Rule 620; *In re Rome*, 218 Kan. 198, Syl. ¶ 9; Supreme Court Rule 211(f).

Respondent also suggests he "has been singled out and made an example of," running afoul of the dictates of *Taylor v. Taylor*, 185 Kan. 324, 328, 342 P.2d 190 (1959). Respondent does not say how this alleged disparate treatment rises to the level of a violation of equal protection. In *Taylor*, a divorce case, an attorney regularly engaged in practice in Missouri and also licensed in Kansas argued he had been singled out for disparate treatment. The district court instructed the attorney that he must associate with a local Kansas attorney to proceed in district court. A Supreme Court Rule at the time provided that an attorney regularly practicing outside Kansas may be recognized in a proceeding only after associating with local counsel. This court held the attorney was not singled out or made an example of. The attorney, by his own choice brought himself within the rule by regularly practicing in Missouri. 185 Kan. at 328. Respondent's equal protection claim fails.

### Nonlawyer Commission Members

Respondent next contends that the presence of lay persons on the Commission denied him due process. He argues, "It is incongruous for a layperson with no legal training whatsoever to decide if a judge has made a correct legal decision and apply facts to the law." Respondent compares the function of the lay Commission members to the unauthorized practice of law.

This argument also goes nowhere. The presence of two lay members on the nine-member Commission was mandated by this court in 1974 when the Code was adopted. Supreme Court Rule 602, 214 Kan. civ. All 50 state judicial qualification commissions have lay members. In seven states, a majority of commission members are neither lawyers nor judges. See Gray, Handbook for Members of Judicial Conduct Commissions, p. 3 (1999). We have in Kansas lay judges with powers far greater than that of the lay Commission members. See, *e.g.*, K.S.A. 20-337; K.S.A. 1999 Supp. 20-302b (on powers and qualifications of district magistrate judges).

The presence of lay members on the Commission is decidedly important. Lay members bring unique qualifications and perspectives to the Commission. For example, in determining whether a particular set of circumstances gives rise to "an appearance of impropriety," a lay member's opinion may be insightful. The lay member is in a unique position to express the views of litigants and other members of the public who may be affected by a judge's conduct. Such is the case here, where Respondent's conduct affected litigants in a subtle, but important, way—it denied certain litigants their choice of counsel.

## Commission Recusal

Respondent next takes issue with the Commission's failure to recuse itself from hearing his case. He also suggests there is no mechanism by which a sitting judge may seek disqualification of any panel member on the Commission.

On March 4, 1999, Respondent orally moved for the entire Commission to recuse itself from hearing the complaints against him. The Commission denied Respondent's oral motion on April 7, 1999. On May 14, 1999, Respondent made a second motion asking the Commission to recuse, this time in writing and with Respondent's supporting affidavit attached. Respondent sought recusal, contending the Commission could not afford him a fair and impartial hearing. The Commission again denied his motion. We also denied the motion as premature. Respondent renews his motion in this appeal.

Respondent's supporting affidavit either concerns accusations against the Examiner or adverse rulings by the Commission. Although Respondent alleges bias, none of the complaints in his affidavit show that the Commission as a whole, or its individual members, are biased against him. Nor have individual Commission members expressed a bias. On the contrary, during the proceedings, the Commission made significant rulings in favor of Respondent. First, the Commission sustained Respondent's objection to the Examiner's discovery requests for admissions and interrogatories. Respondent was not required to supply the requested written information to the Examiner. Second, the Commission ac-

cepted Respondent's proposal to dismiss the allegation of failure to cooperate in the Commission's investigation in Docket 652 (the cease and desist order).

The Commission considered Respondent's claim of bias and rejected the claim, saying:

"[T]he Commission notes that 'judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.' *Liteky v. United States,* 510 U.S. 540, 555, 114 S. Ct. 1147, 1157 (1994) (citing United *States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S. Ct. 1698, 1710 (1966); *cf. Logan v. Logan,* 23 Kan. App. 2d 920, 931-32 (1997) ('Previous rulings of a trial judge, although numerous and erroneous, are not alone sufficient to show the required bias or prejudice to disqualify a judge. . . .' (quoting *State ex rel. Miller v. Richardson,* 229 Kan. 234, 238 [1981]).

"Indeed, without other comments or stated opinion by the adjudicator, '[rulings] cannot possibly show reliance upon an extrajudicial source; and can only in the rarest of circumstances evidence the degree of favoritism or antagonism required . . . when no extrajudicial source is involved.' *Liteky,* 510 U.S. at 555, 114 S. Ct. at 1157. While the Respondent draws attention to some rulings from the previous proceeding that were contrary to his wishes, including the denial of a motion to dismiss and the decision to admonish the Respondent, he does not aver any facts to demonstrate that the Commission relied on extrajudicial information, nor does he cite to any comments or stated opinions made by members of the Commission to demonstrate that inappropriate favoritism so permeated the proceedings as to deny him a fair proceeding. . . . Thus, with respect to the proceedings in Docket Number 612 [the Campbell incarceration], the Respondent has failed to allege facts sufficient to show that the Commission is unfavorably predisposed against him."

The Commission's reasoning is sound. Respondent fails to show bias or prejudice by the Commission requiring recusal. "As a general rule, bias or prejudice that is caused by occurrences in the context of a court proceeding is not grounds for disqualification." Shaman, Lubet & Alfini, Judicial Conduct and Ethics § 4.05 (3d ed. 2000).

With respect to Respondent's complaint that there is no formal procedure for seeking disqualification of the Commission members, it is important to note that there has been no suggestion Respondent could not seek disqualification. In fact, the Commission considered and denied his request on the merits. We have also

addressed the issue on the merits. The Commission did not err in refusing to disqualify itself.

### A Fair and Impartial Hearing

After we reviewed the entire file and transcripts of this proceeding, we have no doubt that Respondent received a fair and impartial hearing by the Commission.

### CONCLUSION

We note one final matter: On August 3, 1999, Respondent appeared at the Shawnee County courthouse to have his deposition taken by the Examiner in Commission Dockets 652 (cease and desist) and 683 (this case). According to the Examiner, the deposition was intended to be "a discovery deposition" and the Examiner believed he would be able to use portions of the deposition at Respondent's mid-August hearing ("under the rules which allow the admission or the receipt of admissions against interest"). After answering several routine questions, *e.g.*, name, judicial district, date of appointment, administrative judge, Respondent refused to answer any further questions.

The Examiner filed a "Motion for a Finding that Respondent is in Contempt of Order to Proceed with Deposition" with the Commission. The motion was referred by the Commission to this court. We take no formal action on the motion. The matter is moot.

IT IS THEREFORE ORDERED that Judge David R. Platt should be and he is hereby publicly censured by this court.

IT IS FURTHER ORDERED that: (1) Respondent be disqualified from any and all cases in which present or future members of the Hoover law firm appear, including but not limited to, Richard Pinaire, Peter Charles Rombold, and Stephen Mark Edwards, (2) Respondent be disqualified from any and all cases in which Walter Pete Robertson or future associates or partners of Walter Pete Robertson appear, (3) any administrative orders and local rules of the 8th Judicial District shall conform to our opinion, effective this date, and (4) the costs of this action be assessed to the Respondent,

and (5) this opinion and order be published in the official Kansas Reports and shall constitute the public record in this matter.

IT IS SO ORDERED.

ABBOTT, J., not participating.

ADRIAN J. ALLEN, Senior Judge, assigned.[1]

---

[1] **REPORTER'S NOTE:** Judge Allen was appointed to hear case No. 83,955 vice Justice Abbott pursuant to the authority vested in the Supreme Court by K.S.A. 20-2616.